## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | |
| | ) | JURY DEMAND |
| | ) | |
| CITADEL FEDERAL CREDIT UNION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

The United States of America (the "United States") brings this action against Citadel Federal Credit Union ("Citadel") under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3619, and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691–1691f, to remedy discrimination in Citadel's residential mortgage lending. In support of this Complaint, the United States alleges as follows:

## INTRODUCTION

1.      The FHA and ECOA prohibit creditors, including credit unions, from discriminating in the provision of home loans and other credit services on the basis of race, color, national origin, and other characteristics.

2.      "Redlining" is one type of discrimination prohibited under the FHA and ECOA. Redlining occurs when lenders discourage loan applications, deny equal access to home loans and other credit services, or avoid providing home loans and other credit services to neighborhoods based on the race, color, or national origin of the residents of those neighborhoods.

3.      From 2017 through at least 2021 (the "Relevant Time Period"), Citadel engaged in a pattern or practice of unlawful redlining in its "market area," which includes Bucks, Chester,

Delaware, Lancaster, Montgomery, and Philadelphia Counties, Pennsylvania. Specifically, Citadel avoided providing home loans[1] and other mortgage services in majority-Black and Hispanic neighborhoods[2] in its market area. Citadel also engaged in acts and practices directed at prospective applicants that would discourage them from applying for credit in Citadel's market area.

4. Citadel's redlining practices included locating and maintaining all but one of its 24 branches in majority-White neighborhoods. Nearly one quarter of all residential census tracts in Citadel's market area are majority-Black and Hispanic, and 76 percent of those tracts are located in Philadelphia County, where Citadel has never opened a branch. While Philadelphia is the most populous county and self-defined "hub" of Citadel's operations, it is the only county in Citadel's market area without a branch.

5. In 2009, Citadel represented to its regulator, the National Credit Union Administration ("NCUA"), that it would open at least three branches in Philadelphia County and implement a community outreach plan to ensure that it reached "underserved residents" there. However, Citadel never opened these branches or implemented its outreach plan, opting instead to expand rapidly into suburban, majority-White neighborhoods.

6. Since at least 2016, Citadel knew it was at risk of violating fair lending laws, as a third-party report commissioned by Citadel that year showed much lower percentages of

---

[1] In this Complaint, the terms "home loans" and "mortgage loans" refer to loans that Citadel and other creditors must report under the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. §§ 2801–2819. "Mortgage lending" refers to the provision of such loans.

[2] A "majority-Black and Hispanic" census tract ("MBHCT") is defined as a residential census tract in which more than 50 percent of the residents are identified as either "Black or African American" or "Hispanic or Latino" by the United States Census Bureau. This Complaint uses the terms "majority-Black and Hispanic census tract," "majority-Black and Hispanic area," and "majority-Black and Hispanic neighborhood" interchangeably and does the same for "majority-White census tract," "majority-White area," and "majority-White neighborhood."

applications from "minority borrowers" as compared to other lenders in its market area. Nevertheless, Citadel failed to take any steps to address this disparity.

7.    As a result of the above-described practices, Citadel generated disproportionately low numbers of loan applications and home loans during each year in the Relevant Time Period from majority-Black and Hispanic neighborhoods within its market area as compared to similarly situated lenders.

8.    Citadel's conduct and practices were intended to deny, and had the effect of denying, equal access to home loans for those residing in, or seeking credit for properties located in, majority-Black and Hispanic neighborhoods and otherwise discouraged those individuals from applying for home loans on the basis of race, color, or national origin.

9.    Citadel's conduct was not justified by a legitimate, nondiscriminatory reason or business necessity and was not necessary to achieve a substantial, legitimate, nondiscriminatory interest.

## JURISDICTION AND VENUE

10.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1345, 42 U.S.C. § 3614(a), and 15 U.S.C. § 1691e(h) because the action arises under the laws of the United States, and the United States brings this case as a plaintiff.

11.    Venue is proper in the Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

12.    Plaintiff, the United States, brings this action to enforce the FHA and ECOA. The FHA and ECOA authorize the Attorney General to bring a civil action in federal district court whenever he has reason to believe that an entity is engaged in a pattern or practice of resistance to

the full enjoyment of rights secured by the FHA and ECOA. 42 U.S.C. § 3614(a); 15 U.S.C. § 1691e(h). The FHA further authorizes the Attorney General to bring suit where the defendant has denied rights to a group of persons and that denial raises an issue of general public importance. 42 U.S.C. § 3614(a).

13.    Defendant Citadel is a "federal credit union," which is a member-owned, not-for-profit institution governed by the Federal Credit Union Act, 12 U.S.C. § 1752(1), and formed to provide its members with financial services. Citadel is headquartered in Exton, Pennsylvania, and is subject to the regulatory authority of the NCUA. At all times relevant to this Complaint, Citadel has offered business and personal banking, mortgage and other home loan products, wealth management and retirement services, and insurance. In 2020, Citadel was the eighteenth largest lender in its market area and the second largest credit union in the Greater Philadelphia area.

14.    Citadel currently maintains 24 branches within its market area.

15.    As of June 2024, Citadel had over 263,000 members, and its total assets equaled approximately $6 billion.

16.    Citadel is subject to the FHA, ECOA, and their respective implementing regulations, 24 C.F.R. pt. 100, 12 C.F.R. pt. 1002.

17.    Citadel is a "creditor," as defined by ECOA, 15 U.S.C. § 1691a(e), and is engaged in "residential real estate-related transactions," as defined by the FHA, 42 U.S.C. § 3605.

## FACTUAL ALLEGATIONS

### Citadel's Field of Membership and Market Area

18.      As a community credit union, Citadel can only offer services within its "field of membership." *See* 12 U.S.C. 1759(b).

19.      Since 2009, Citadel's field of membership, which was approved by the NCUA, has comprised Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties, Pennsylvania, and the City of Lancaster, Pennsylvania. *See* **Exhibit A**.

20.      Citadel operates two branches and does significant lending in Lancaster County outside the City of Lancaster, so the entirety of Lancaster County is included in Citadel's "market area." Accordingly, Citadel's market area comprises Citadel's field of membership along with Lancaster County. The market area has approximately 4.7 million residents. Of these residents, 63 percent are White, 20 percent are Black, 9 percent are Hispanic or Latino, 6 percent are Asian, and 2 percent are other races. Throughout the Relevant Time Period, the vast majority of Citadel's residential mortgage lending occurred within this market area.

21.      Citadel's market area contains 1,086 census tracts with at least one resident, of which 771 (71 percent) are majority-White and 259 (24 percent) are majority-Black and Hispanic. The remaining 56 census tracts (5 percent) are "majority-minority," but not majority-Black and Hispanic, meaning that, according to the United States Census Bureau, at least 50 percent of the residents are not White, but fewer than 50 percent are Black or Hispanic.

22.      Philadelphia County contains 198 of the 259 majority-Black and Hispanic tracts within Citadel's market area, meaning the county contains 76 percent of all majority-Black and

Hispanic tracts in the market area. The majority of the Black and Hispanic population within Citadel's market area lives in Philadelphia County.

23.    The remaining 61 majority-Black and Hispanic tracts in Citadel's market area are located in Bucks, Chester, Delaware, Lancaster, and Montgomery Counties, with no more than 33 majority-Black and Hispanic tracts in a single county. Specifically, Bucks County has zero majority-Black and Hispanic census tracts; Chester County has 7; Delaware County has 33; Montgomery County has 14; and Lancaster has 7. Thus, Philadelphia County has at least 165 more majority-Black and Hispanic census tracts than any other county in Citadel's market area.

**Citadel Located Branches Almost Exclusively in Majority-White Neighborhoods.**

24.    During the Relevant Time Period, Citadel operated between 20 and 24 branches in its market area. All of those branches were "full-service" branches, which offered the full suite of Citadel's retail products and services, including accepting residential mortgage loan inquiries and applications.

25.    During the Relevant Time Period, Citadel operated only one of its 20-24 branches in a majority-Black and Hispanic tract even though those census tracts represented approximately 24 percent of the overall census tracts within its market area. This sole branch in a majority-Black and Hispanic neighborhood opened in 1963 in Chester County, when Citadel served only employees of Lukens Steel Company and not the surrounding area.

26.    Citadel's expansion and branching decisions show an intent to avoid providing credit in majority-Black and Hispanic tracts in its market area. Between 2009 and 2016, Citadel expanded out of Chester County and opened eleven branches, including in Bucks, Delaware, Lancaster, and Montgomery Counties. All eleven branches were located in majority-White census tracts.

27.     During the Relevant Time Period, Citadel opened three additional branches, again locating all of those branches in majority-White areas in its market area. As a result of its branching strategy, Citadel has one branch in Bucks County, 11 branches in Chester County, 3 branches in Delaware County, 2 branches in Lancaster County, 7 branches in Montgomery County, and zero branches in Philadelphia County, despite it containing 34 percent of the market area's overall population and over three-quarters of its majority-Black and Hispanic census tracts. *See* **Exhibit B**.

28.     Throughout the Relevant Time Period, Citadel knew it was not serving the credit needs of "minority" applicants in its market area but did not take steps to address these deficiencies. For example, a third-party analysis of annual HMDA data showed that Citadel trailed its peers in mortgage applications and originations from "minority" customers in nearly every county in its field of membership since at least 2016, yet Citadel chose to open all of its new branches during the Relevant Time Period in majority-White areas.

29.     By concentrating all but one of its branches in majority-White areas, Citadel discouraged residents of majority-Black and Hispanic areas from applying for and obtaining home loans and restricted their access to Citadel's credit and mortgage lending services.

**Citadel Failed to Address the NCUA's Concerns About Providing Access to Credit for Residents of Underserved Areas.**

30.     Beginning in 2006, and on several occasions since then, the NCUA informed Citadel that it was concerned Citadel was failing to provide credit services to "underserved areas" in Philadelphia County.

31.     In 2009, the NCUA approved Citadel to expand its field of membership after Citadel represented that it would provide credit services to underserved areas in Philadelphia County. Specifically, Citadel stated that it would open 3 branches and conduct targeted outreach

and marketing in Philadelphia County.

32.     Citadel failed to follow through on these representations. Since 2009, and throughout the Relevant Time Period, Citadel failed to open a single branch or conduct any outreach and marketing to Philadelphia County.

33.     In fact, once the NCUA approved the charter expansion, Citadel immediately pivoted away from Philadelphia. In a Board meeting soon after Citadel received approval for the charter expansion in 2009, Citadel's President and CEO at the time noted that the proposal to the NCUA was not a "promise" to open branches in particular areas.

34.     Citadel's failure to take these measures to provide credit was intended to deny, and had the effect of denying, equal access to home loans for those residing in, or seeking credit for properties located in, majority-Black and Hispanic neighborhoods in its market area.

### Citadel Failed to Maintain Adequate Policies and Practices to Monitor Fair Lending Compliance.

35.     During the Relevant Time Period, Citadel lacked adequate policies and practices to monitor fair lending compliance and to ensure that it was providing equal access to credit to majority-Black and Hispanic neighborhoods.

36.     Although Citadel has had a written fair lending policy since at least 2012, it has not taken adequate measures to implement its policy or monitor compliance with federal fair lending laws. A 2020 NCUA fair lending exam found that Citadel did not provide fair lending training to officials, including its board of directors and supervisory committee, and that it had never conducted a "comprehensive fair lending risk assessment," which are standard practices in the mortgage lending industry.

37.     When, at the behest of the NCUA, Citadel finally retained a third-party to conduct an audit of its fair lending program, the auditor found that Citadel lacked adequate internal

procedures and personnel to monitor compliance with fair lending laws and recommended that Citadel establish "a fair lending committee or other governing body dedicated to fair lending issues." But Citadel rejected this recommendation and still had not conducted a single redlining risk assessment as of November 2022.

38.     During the Relevant Time Period, Citadel knew its fair lending policies and practices were deficient, but even after these deficiencies were identified by its regulator and by a third party, it did not take steps to address them.

### Citadel Failed to Ensure Its Outreach, Marketing, or Advertising Reached Majority-Black and Hispanic Neighborhoods to Generate Mortgage Loan Applications.

39.     During the Relevant Time Period, Citadel failed to ensure its outreach, marketing, and advertising for its mortgage lending services reached majority-Black and Hispanic neighborhoods, thereby failing to serve the home loan needs of the residents in these areas.

40.     In the majority-White neighborhoods within the market area, Citadel's mortgage-lending services were available to prospective applicants who walked into its physical branches. Because there was only one Citadel branch in a majority-Black and Hispanic neighborhood in Chester County, and none in Philadelphia County where 76 percent of the majority-Black and Hispanic census tracts within Citadel's market area are located, these services were not readily available to the vast majority of residents of those neighborhoods.

41.     Citadel took no steps to train or incentivize its mortgage loan originators to compensate for its lack of branches and serve the residents of majority-Black and Hispanic neighborhoods. Citadel assigned each mortgage loan originator to take applications from borrowers around particular branches but assigned no mortgage loan originators to take applications from borrowers in Philadelphia County despite Philadelphia County accounting for 34 percent of Citadel's overall market area.

42.     During the Relevant Time Period, Citadel's marketing and outreach strategy was focused primarily on "brand recognition" and failed to include any efforts to market and advertise its mortgage lending services to majority-Black or Hispanic areas.

43.     Citadel did not monitor where it distributed its marketing or outreach materials to ensure that such distribution occurred in all neighborhoods throughout its market area.

44.     Citadel occasionally used direct mail campaigns to attract new members. When it conducted these campaigns, Citadel sent mail to residents located near existing Citadel branches. Because all but one branch were located in majority-White areas, these direct mail campaigns were unlikely to reach residents of majority-Black and Hispanic neighborhoods.

45.     Citadel used direct mail and e-mail campaigns to market mortgage loan services to existing members. For example, in 2020, Citadel had a policy of using credit score minimums to help determine which existing members would receive direct mail. These minimums were higher than the underwriting requirements for home loans.

46.     Citadel took no meaningful steps to generate mortgage loan applications from majority-Black and Hispanic areas within its market area during the Relevant Time Period.

47.     Citadel did not conduct any advertising or marketing in Spanish or otherwise attempt to reach Hispanic areas within its market area, even though 9 percent of the population within Citadel's market area identifies as Hispanic and there are 30 census tracts within Citadel's market area in which over 50 percent of the residents are Hispanic. Citadel did not translate direct mailings or other materials into Spanish. Citadel's own fair lending policy prohibits "using only English in an area where the majority of the members or potential members are non-English speaking." However, Citadel made no effort to determine whether areas within its market area were majority non-English speaking.

48.    Similarly, during the Relevant Time Period, Citadel employed no mortgage loan originators, and only one mortgage loan advisor, who spoke Spanish. As a result, the vast majority of Citadel's employees responsible for assisting customers with residential real estate loans were unable to provide mortgage lending services to Spanish-speaking applicants and prospective applicants.

49.    During the Relevant Time Period, Citadel conducted home buyers seminars to promote Citadel's First Time Home Buyers program. The first seminar was conducted at Citadel's headquarters in a majority-White area in Chester County. In subsequent years, Citadel held these seminars at branches and a local library in majority-White census tracts. Citadel held no seminars in majority-Black and Hispanic neighborhoods, which reduced the likelihood that a resident of such a neighborhood would learn about or be able to attend one. Because participants received financial incentives for attending a seminar in the form of reduced closing costs upon taking out a Citadel residential mortgage, Citadel effectively denied residents of majority-Black and Hispanic neighborhoods this cost-saving opportunity.

50.    Citadel's failure to make any meaningful efforts to ensure its outreach, advertising, and marketing reached majority-Black and Hispanic neighborhoods was intended to deny, and had the effect of denying, equal access to home loans for those residing in, or seeking credit for properties located in, majority-Black and Hispanic neighborhoods within its market area.

**Citadel Received Disproportionately Low Numbers of Home Loan Applications from Majority-Black and Hispanic Neighborhoods.**

51.    Citadel's lending practices demonstrate a pattern of disproportionately failing to serve majority-Black and Hispanic neighborhoods within its market area, particularly when compared with its "peer lenders." "Peer lenders" are similarly-situated financial institutions that

received between 50 percent and 200 percent of Citadel's annual volume of home mortgage loan applications.

52.     Citadel's policies and practices alleged herein—including the concentration of its branches, marketing, and outreach in majority-White neighborhoods—discriminated against and discouraged applicants and prospective applicants in majority-Black and Hispanic neighborhoods within the market area from applying for and obtaining home loans and other mortgage-related services.

53.     Citadel's own data on loan applications and originations that it is required to report to regulators under HMDA confirm that Citadel avoided serving majority-Black and Hispanic neighborhoods in its market area. *See* **Exhibit C**.

54.     During the Relevant Time Period, Citadel significantly underperformed its peer lenders in generating home mortgage applications from majority-Black and Hispanic neighborhoods within its market area.

55.     The disparity between the rate of applications generated by Citadel and the rate generated by its peer lenders from majority-Black and Hispanic neighborhoods is both statistically significant—meaning unlikely to be caused by chance—and sizable in every year from 2017 through 2021.

56.     Specifically, of the 16,324 HMDA-reportable mortgage applications Citadel generated from 2017 through 2021 within its market area, only 5 percent came from residents of majority-Black and Hispanic areas. By contrast, during the same time period, Citadel's peers generated, on average, 13 percent of their HMDA applications from these same majority-Black and Hispanic neighborhoods. These disparities are statistically significant across the five-year period and in every year during the Relevant Time Period.

57.    In other words, from at least 2017 through 2021, Citadel's peer lenders generated applications from majority-Black and Hispanic areas at nearly three times the rate of Citadel.

58.    The statistically significant disparities between applications Citadel generated from majority-Black and Hispanic neighborhoods and those that its peers generated show that there were significant numbers of residents in majority-Black and Hispanic areas in the market area who were seeking home loans. Citadel had no legitimate, non-discriminatory reason to draw so few applications from these areas.

59.    The data show a statistically significant failure by Citadel, relative to its peer lenders, to draw applications for home loans and provide residential mortgage services to residents in majority-Black and Hispanic neighborhoods on a non-discriminatory basis in every year during the Relevant Time Period.

**Citadel Made Disproportionately Low Numbers of Home Loans to Applicants in Majority-Black and Hispanic Neighborhoods.**

60.    Citadel's lending practices discouraged applicants and prospective applicants in majority-Black and Hispanic neighborhoods from seeking home loans. As a result, Citadel made a smaller percentage of HMDA-reportable residential mortgage loans in these neighborhoods compared to its peers during the Relevant Time Period.

61.    The disparity between the rate of home loans that Citadel made and the rate made by its peer lenders in majority-Black and Hispanic neighborhoods is both statistically significant and sizable in every year during the Relevant Time Period.

62.    Specifically, of the 9,473 HMDA-reportable residential mortgage loans Citadel made from 2017 through 2021 in its market area, only 3 percent were to residents of majority-Black and Hispanic areas. By contrast, Citadel's peers made 10 percent of their HMDA loans to these same majority-Black and Hispanic neighborhoods during the Relevant Time Period.

63.    In other words, from 2017 through 2021, Citadel's peer lenders made home loans in majority-Black and Hispanic areas at more than three times the rate of Citadel.

64.    These disparities are statistically significant across the five-year period and in every year of the Relevant Time Period.

65.    The level of lending by Citadel's peers demonstrates that there were thousands of qualified borrowers for home loans and sufficient mortgage loan demand in majority-Black and Hispanic neighborhoods within its market area. Citadel had no legitimate, non-discriminatory reason to originate so few loans from these areas.

66.    The data show a statistically significant failure by Citadel to make home loans and provide residential mortgage services to qualified applicants in majority-Black and Hispanic neighborhoods on a non-discriminatory basis when compared with similarly situated lenders in every year during the Relevant Time Period.

**Citadel Failed to Address Its Known Redlining Risk.**

67.    As early as 2016 and continuing throughout the Relevant Time Period, Citadel was aware that its operations posed a redlining risk in its market area.

68.    A 2016 report from a third-party vendor that Citadel retained to analyze its market performance informed Citadel that it trailed other lenders in mortgage applications from Black and Hispanic residents in its market area. Specifically, the report indicated that only 9 percent of Citadel's mortgage applications were from "minority" applicants, compared to 20 percent of applicants at other credit unions, 15 percent of applicants at banks, and 15 percent of applicants for all other lenders.

69.    This report also informed Citadel that it trailed other lenders in mortgage applications from Black and Hispanic residents in each county within the market area. For

example, in Delaware County, only 11 percent of Citadel's mortgage applications were from "minority" applicants, compared to 21 percent of applicants at other credit unions, 17 percent of applicants at banks, and 17 percent of applicants at all other lenders.

70.    Despite its known redlining risk, Citadel took no action in response to this report indicating that it was underserving minority borrowers within its market area.

## CLAIMS FOR RELIEF

### COUNT I
### (VIOLATIONS OF THE FAIR HOUSING ACT)

71.    The United States incorporates all prior paragraphs of the Complaint as if fully set forth herein.

72.    Citadel's policies and practices constitute the unlawful redlining of majority-Black and Hispanic communities within its market area on the basis of the racial, color, and national origin composition of those communities. Citadel's policies and practices were intended to deny, and had the effect of denying, equal access to home loans to residents of majority-Black and Hispanic communities and those seeking credit for properties located in those communities. Citadel's conduct was not justified by business necessity or legitimate business considerations.

73.    Citadel's actions as alleged herein constitute:

    a.    Discrimination on the basis of race, color, and national origin in making available residential real estate-related transactions, or in the terms or conditions of residential real estate-related transactions, in violation of the Fair Housing Act, 42 U.S.C. § 3605(a), and its implementing regulation, 24 C.F.R. §§ 100.110(b), 100.120;

b.  The making unavailable or denial of dwellings to persons because of race, color, and national origin, in violation of the Fair Housing Act, 42 U.S.C. § 3604(a), and its implementing regulation, 24 C.F.R. § 100.50(b)(3); and

c.  Discrimination on the basis of race, color, and national origin in the terms, conditions, or privileges of the sale or rental of dwellings, or the provision of services or facilities in connection with the sale or rental of dwellings, in violation of the Fair Housing Act, 42 U.S.C. § 3604(b), and its implementing regulation, 24 C.F.R. §§ 100.50(b)(2), 100.65.

74.  Citadel's actions violated 42 U.S.C. § 3614(a) because its policies and practices as alleged herein constitute:

a.  A pattern or practice of resistance to the full enjoyment of rights secured by the Fair Housing Act; and

b.  A denial of rights granted by the Fair Housing Act to a group of persons that raises an issue of general importance.

75.  Citadel's pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

76.  Persons who have been victims of Citadel's discriminatory policies and practices are "aggrieved," as defined in 42 U.S.C. § 3602(i), and have suffered damages as a result of Citadel's conduct in violation of the Fair Housing Act, as described above.

## COUNT II
## (VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT)

77.  The United States incorporates all prior paragraphs of the Complaint as if fully set forth herein.

78.    Citadel's acts, policies, and practices as alleged herein constitute unlawful discrimination against applicants and prospective applicants, including by redlining majority-Black and Hispanic communities within its market area and engaging in acts and practices directed at prospective applicants that would discourage prospective applicants from applying for credit on the basis of race, color, or national origin in violation of the Equal Credit Opportunity Act and Regulation B. 15 U.S.C. §§ 1691–1691f; 12 C.F.R. § 1002.4(a)–(b).

79.    Citadel's policies and practices as alleged herein constitute a pattern or practice of discrimination and discouragement and resistance to the full enjoyment of rights secured by the Equal Credit Opportunity Act, in violation of the Act. 15 U.S.C. § 1691e(h).

80.    Citadel's pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

81.    Persons who have been victims of Citadel's discriminatory policies and practices are "aggrieved," as defined in 15 U.S.C. § 1691e(a), and have suffered damages as a result of Citadel's conduct in violation of the Equal Credit Opportunity Act, as described above.

## REQUEST FOR RELIEF

WHEREFORE, the United States respectfully requests that judgment be entered in its favor and against Defendant Citadel as follows:

(1) Declaring that the conduct of Defendant Citadel violates the Fair Housing Act;

(2) Declaring that the conduct of Defendant Citadel violates the Equal Credit Opportunity Act;

(3) Enjoining Defendant Citadel, its agents, employees, and successors, and all other persons in active concert or participation with Defendant Citadel, from:

A.  Discriminating on account of race, color, or national origin in any aspect of their lending business practices;

B.  Discouraging applicants on account of race, color, or national origin;

C.  Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of Defendant Citadel's unlawful practices to the position they would be in but for the discriminatory conduct;

D.  Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of Defendant Citadel's unlawful practices, and providing policies and procedures to ensure all segments of Defendant Citadel's market area are served without regard to prohibited characteristics;

(4)  Awarding monetary damages against Defendant Citadel in accordance with 42 U.S.C. § 3614(d)(1)(B) and 15 U.S.C. § 1691e(h);

(5)  Assessing a civil penalty against Defendant Citadel in an amount authorized by 42 U.S.C. § 3614(d)(1)(C), in order to vindicate the public interest; and

(6)  Awarding the United States such further relief as the interests of justice may require.

## DEMAND FOR JURY TRIAL

The United States demands trial by jury in this action on all issues so triable.

Respectfully submitted this 10th day of October, 2024.


**FOR THE UNITED STATES OF AMERICA:**

MERRICK B. GARLAND
Attorney General


*/s/ Jacqueline C. Romero*
JACQUELINE C. ROMERO          KRISTEN CLARKE
United States Attorney          Assistant Attorney General
Eastern District of Pennsylvania          Civil Rights Division


*/s/ Lauren DeBruicker*          */s/ Adam M. Wesolowski*
GREGORY B. DAVID          CARRIE PAGNUCCO
Assistant United States Attorney          Chief
Chief, Civil Division          TAMICA H. DANIEL
CHARLENE KELLER FULLMER          Deputy Chief
Assistant United States Attorney          ADAM M. WESOLOWSKI
Deputy Chief, Affirmative Litigation          TERRENCE K. MANGAN, JR.
LAUREN DEBRUICKER          Trial Attorneys
Assistant United States Attorney          Housing & Civil Enforcement Section
Deputy Civil Chief for Civil Rights          Civil Rights Division
          U.S. Department of Justice
*/s/ Bryan C. Hughes*          150 M Street, NE
BRYAN C. HUGHES          Washington, DC 20530
Assistant United States Attorney          Phone: (202) 514-4713
United States Attorney's Office          Fax: (202) 514-1116
Eastern District of Pennsylvania          adam.m.wesolowski@usdoj.gov
615 Chestnut Street, Suite 1250          terrence.mangan2@usdoj.gov
Philadelphia, PA 19106
Phone: (215) 861-8433
Bryan.Hughes@usdoj.gov

JS 44   (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | Citadel Federal Credit Union |

| (b)  County of Residence of First Listed Plaintiff _____ | County of Residence of First Listed Defendant   Chester County |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c)  Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| See attachment | Patrick J. Egan / Christopher J. Pippett, Fox Rothschild, 2000 Market Street, 20th Floor, Philadelphia, PA 19103 / (215) 299-2825/(267) 458-6703 |

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

[x] 1   U.S. Government
        Plaintiff

[ ] 2   U.S. Government
        Defendant

[ ] 3   Federal Question
        *(U.S. Government Not a Party)*

[ ] 4   Diversity
        *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [x] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 550 Civil Rights [ ] 555 Prison Condition [ ] 560 Civil Detainee - Conditions of Confinement | [ ] 465 Other Immigration Actions | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

[x] 1   Original
        Proceeding

[ ] 2   Removed from
        State Court

[ ] 3   Remanded from
        Appellate Court

[ ] 4   Reinstated or
        Reopened

[ ] 5   Transferred from
        Another District
        *(specify)*

[ ] 6   Multidistrict
        Litigation -
        Transfer

[ ] 8   Multidistrict
        Litigation -
        Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Fair Housing Act, 42 USC 3601-3619; Equal Credit Opportunity Act, 15 USC 1691-1691f

Brief description of cause:
Violations of FHA and ECOA (and its implementing Regulation B)

## VII.  REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   [x] Yes   [ ] No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| Oct 10, 2024 | /s/ Bryan C. Hughes |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**Attachment to Civil Cover Sheet (<u>USA v. Citadel Federal Credit Union</u>);**

**Attorneys of Record for Plaintiff United States of America**


Adam M. Wesolowski

Terrence K. Mangam, Jr.

*Trial Attorneys*

Housing and Civil Enforcement Section

Civil Rights Division

U.S. Department of Justice

150 M Street, NE

Washington, DC 20530

Phone:  (202) 514-4713

Adam.Wesolowski@usdoj.gov

Terrence.Mangan2@usdoj.gov

Jacqueline C. Romero

*United States Attorney*

Gregory B. David

*Chief, Civil Division*

Bryan C. Hughes

*Assistant United States Attorney*

Office of the United States Attorney

615 Chestnut Street, Suite 1250

Philadelphia, PA 19106-4476

Phone:  (215) 861-8433

Bryan.Hughes@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _950 Pennsylvania Avenue, N.W., Washington, DC 20530_

Address of Defendant: _520 Eagleview Blvd., Exton, PA 19341_

Place of Accident, Incident or Transaction: _Philadelphia metropolitan statistical area_

---

**RELATED CASE IF ANY:**

Case Number:_____ Judge:_____ Date Terminated_____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit Pending or within one year previously terminated action in this court?   Yes ☐   No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier Numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se case filed by the same individual?   Yes ☐   No ☒

I certify that, to my knowledge, the within case ☐ **is** / ☒ **is not** related to any now pending or within one year previously terminated action in this court except as note above.

DATE:     _/s/ Bryan C. Hughes_        _PA 318042_

       Attorney-at-Law *(Must sign above)*        Attorney I.D. # (if applicable)

---

**Civil** (Place a √ in one category only)

*A. Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Wage and Hour Class Action/Collective Action
☐ 6. Patent
☐ 7. Copyright/Trademark
☐ 8. Employment
☐ 9. Labor-Management Relations
☐ 10. Civil Rights
☐ 11. Habeas Corpus
☐ 12. Securities Cases
☐ 13. Social Security Review Cases
☐ 14. Qui Tam Cases
☒ 15. All Other Federal Question Cases. *(Please specify):* _Violations of FHA & ECOA_

*B. Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):*_____
☐ 7. Products Liability
☐ 8. All Other Diversity Cases: *(Please specify)*_____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration)*

I, _Bryan C. Hughes_, counsel of record *or* pro se plaintiff, do hereby certify:

☐   Pursuant to Local Civil Rule 53.2 § 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☒   Relief other than monetary damages is sought.

DATE: _10/10/2024_     _/s/ Bryan C. Hughes_     _PA 318042_

                 Attorney-at-Law *(Sign here if applicable)*     Attorney ID # (if applicable)

NOTE: A trial de novo will be a jury only if there has been compliance with F.R.C.P. 38.